UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL LEE LONG, JR.,<br><br>Defendant. | 3:15-CR-30118-RAL<br><br><br>OPINION AND ORDER<br>DENYING DEFENDANT'S MOTION FOR<br>NEW TRIAL |

Following a jury trial on May 10, 11, and 12, 2016, Defendant Michael Lee Long, Jr. ("Long") was convicted of four counts, including Assault with a Dangerous Weapon, Simple Assault, Prohibited Person in Possession of a Firearm, and Using a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 113(a)(3), 113(a)(5), 922(g)(9), 924(a)(2), 924(c)(1)(A), 924(d), and 1153.[1] Docs. 33, 67.

On May 26, 2016, Long filed a Motion for New Trial under Rule 33(a) of the Federal Rules of Criminal Procedure. Doc. 73. In his motion, Long advances two primary arguments. Doc. 73. First, Long argues that the government failed to turn over certain discovery materials before trial, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Doc. 73 at 1. Second, Long

---

[1] This Court granted Long's motion for judgment of acquittal on three counts charged in the Superseding Indictment: count one, alleging Assault with a Dangerous Weapon as to Robert Kills in Water, and counts six and seven, both alleging violations of Using a Firearm During and in Relation to a Crime of Violence. Docs. 33, 66.

contends that in regard to the conviction of Assault with a Dangerous Weapon, the evidence preponderates heavily against the verdict.[2] Doc. 73 at 1. The government opposes Long's motion. Doc. 75. For the reasons stated below, Long's motion is denied.

## I. FACTS PERTINENT TO MOTION

On the evening of May 17, 2015, Cynthia Jones-Bear Robe ("Jones-Bear Robe") traveled to the Paul Mart Convenience Store ("Paul Mart") in Rosebud, South Dakota, along with her sixteen-year-old daughter, K.M.J.,[3] and her daughter's seventeen-year-old boyfriend, Robert Kills in Water ("Kills in Water"). K.M.J. was driving Jones-Bear Robe's vehicle, a maroon, 2001 Cadillac Escalade, Jones-Bear Robe was in the passenger seat, and Kills in Water was in the back seat. K.M.J. parked near the first pole that was close to Paul Mart's entrance.[4] Jones-Bear Robe went into Paul Mart to purchase individual cigarettes, known as "stick cigarettes," while K.M.J. and Kills in Water waited in the vehicle.

Shortly thereafter, Long and his wife, Delores Long ("Delores"), arrived at Paul Mart. Long parked by the third pole on the same side of the building as K.M.J., leaving a space between the two vehicles.[5] Long was employed by Paul Mart, but was not working the night of May 17, 2015. K.M.J. observed Long and Delores follow Jones-Bear Robe into the store. Jones Bear-Robe testified that Delores went into Paul Mart's office, which is just to the left of the main

---

[2] Long also states in his motion that depending on whether an additional eye witness is located and interviewed, he may move this Court for a motion for new trial grounded on discovery of new evidence. Doc. 73 at 1. No formal motion on those grounds, however, has been made at this time. Doc. 73 at 1.

[3] K.M.J. still is a minor so the Court uses her initials instead of her full name.

[4] There is only one main entrance into Paul Mart. Ex. 2 at 1.

[5] Both K.M.J. and Kills in Water testified that they believed Long had followed them from St. Francis to Paul Mart. Kills in Water testified that Long was driving a dark blue vehicle.

2

entrance, and that Long stood behind her in line for the cashier. After waiting for the cashier to complete a phone call, Jones-Bear Robe asked for stick cigarettes. According to Jones-Bear Robe, Long started "running his mouth" and said, "Why don't you go sell your meth and your pills so you can buy yourself a pack." Jones-Bear Robe testified that Long pushed or nudged her, and she told Long that she was not talking to him, paid for her stick cigarettes, and exited the store. (A video of the encounter between Jones-Bear Robe and Long was captured from Paul Mart security cameras, and while it appears that Long is speaking to Jones-Bear Robe, he does not appear to make physical contact with her inside the store.).

According to Jones-Bear Robe, Long followed her outside, talking to her as she got into the front passenger seat of her vehicle. She called 911, reaching Rosebud Sioux Tribe dispatcher Terri Searby ("Searby"), to talk about a protection or restraining order that was in effect.[6] Jones-Bear Robe testified that Searby asked about the vehicle Long was driving, so she got out of her vehicle to retrieve Long's license plate number. Long, who was standing outside of his vehicle smoking a cigarette, looked upset that she was getting his license plate number. He followed Jones-Bear Robe while she walked back to her vehicle. Jones-Bear Robe testified that once she was in the passenger seat, Long opened the passenger door, pointed a black, toy-looking, hand gun at her, and said he would "shoot you guys." She told K.M.J. to put the car in reverse, but K.M.J. resisted because she did not want to hit Long. Again, she told K.M.J. to reverse fast, and K.M.J. complied. As the vehicle reversed, Jones-Bear Robe testified that Long was running by

---

[6] The protection or restraining order Jones-Bear Robe referenced was an order Delores received against K.M.J., due to issues between Delores and Jones-Bear Robe's family. Jones-Bear Robe testified that similar orders were recently granted for both Delores and K.M.J., but that Long was not involved in those orders until sometime in 2015.

3

the vehicle, rolled under the passenger door, and ended up on the ground some twenty-four to twenty-five feet in front of the vehicle. Because K.M.J. was panicking, Jones-Bear Robe testified that she told K.M.J. to put the vehicle in drive. At that point, Jones-Bear Robe testified that she "heard a ting."[7] She threw herself on top of K.M.J. and heard a second "ting." Jones-Bear Robe then put the vehicle in drive for K.M.J., and K.M.J. drove out of the Paul Mart parking lot, headed towards the Rosebud Sioux Tribe Police Department ("RST Police Department").[8] Ex. 3.

K.M.J. and Kills in Water also testified as to their recollections of the events. K.M.J. recalled that after Jones-Bear Robe returned to the vehicle, Jones-Bear Robe said that Long was behind her in line and that he had poked her and harassed her. K.M.J. described how Jones-Bear Robe got out of the vehicle to obtain Long's license number, and that Long followed Jones-Bear Robe back to the passenger side of the vehicle. According to K.M.J., Long pulled the passenger door open and pulled a black gun out of the left pocket of his long, black jacket with his left hand. K.M.J. testified that Long looked at her and Jones-Bear Robe and said, "I've got something for you," and then pointed the gun at Jones-Bear Robe's head and then at her. K.M.J. panicked, put the vehicle in reverse, and pulled out of the parking lot, causing Long to roll under the door and fall to the ground. Just about when she was going to drive the vehicle forward, K.M.J. testified that she heard four shots—two of which "clinged" off the vehicle—and saw that Long had fired his gun at the vehicle while he was on the ground. When K.M.J. drove out of the

---

[7] Jones-Bear Robe also referred to the "ting" as a "ping," which she later described as the sound the bullet made when it struck her vehicle. She also testified that she could not hear the shots, just the "pings."
[8] The RST Police Department is approximately one mile away from Paul Mart. Ex. 3.

4

parking lot, she testified that Long was standing by the gas pumps and that she still heard shots as she was driving out onto the street. K.M.J. also testified that Delores was standing by Paul Mart's door watching the entire incident, that Long did not know that Kills in Water was in the backseat, and that she denied saying "no" to backing up when told to do so by Jones-Bear Robe.

Kills in Water recalled that Jones-Bear Robe said that Long was pushing her with his finger and harassing her when she was inside Paul Mart. Kills in Water testified that Long followed Jones-Bear Robe after she looked at Long's license plate number and that while standing at the passenger door, Long pulled out a black hand gun from his coat's inside pocket. Kills in Water testified that Long pointed the gun inside the vehicle and said he was going to shoot "them," referring to K.M.J. and Jones-Bear Robe. According to Kills in Water, Long did not see him in the backseat of the vehicle, and the vehicle had tinted windows. Kills in Water testified that he heard four shots; the first shot occurred when K.M.J. was backing up, and the final shot occurred as they were driving away. Kills in Water testified that he could not see Long shooting because he was hiding low in the back seat. Kills in Water acknowledged that he did not see which hand Long was using to hold the gun, that he never told anyone that Long had said anything while he was at the passenger side of the vehicle prior to testifying, and that he did not see Delores or hear her say anything during the time shots were fired.

Officer Albert Little Elk ("Officer Little Elk") and Officer Daniel Reynolds ("Officer Reynolds") responded to Paul Mart after notification from dispatch. Officer Little Elk spoke with the cashier, Marlene Marshall ("Marshall"), and Paul Mart's supervisor, Nicolette "Nikki" Two Charger ("Two Charger"). Two Charger testified that because she was in her office inside Paul Mart, which has cement walls, no outside windows, and one door that leads into the main

5

store area, she did not see or hear anything. Two Charger did, however, see Long enter Paul Mart with Delores through a one-way mirror in her office. Two Charger also saw Jones-Bear Robe at the counter, recognizing her as a frequent customer of the store. She testified that while Long made a purchase at the counter, Delores visited with her inside her office. Two Charger did not become aware of the incident until after the shooting, and Delores left her office only after Long came to get her. According to Two Charger, when Long came to get Delores his demeanor was "quick," and he told Delores that they had to leave.[9]  Officer Little Elk retrieved video surveillance from Two Charger. Ex. 1. Paul Mart's surveillance cameras record only video (no audio) and cover the inside of the store and the gas pumps, but not the side of the building where the incident occurred.

Marshall testified that although she could not recall whether there was any interaction between Long and Jones-Bear Robe while they were in line at Paul Mart's counter, she saw no physical contact between the two. She testified that later she heard one sound, "a bang," or what sounded like two vehicles hitting each other. She looked out the cashier window that faces the gas pumps, but seeing nothing, she resumed helping customers. Marshall testified that she was unaware of the shooting until Officer Little Elk came into the store.

After speaking with Two Charger and Marshall, Officer Little Elk left Paul Mart to speak with Jones-Bear Robe, who he believed was at the RST Police Department.[10]  At some point, Officer Little Elk also spoke with Delores who stated she believed that Jones-Bear Robe had

---

[9] Two Charger testified that she did not pay attention to Long's clothing.

[10] Officer Little Elk located Jones-Bear Robe on the highway, approximately one-quarter mile south of the RST Police Department. Jones-Bear Robe was pushing her inoperable vehicle with her husband who had come to assist her.

attempted to run Long over with her vehicle.  Officer Little Elk also learned that Long also called

dispatch after the incident, talked with Searby, and reported that he was hit and run into at Paul

Mart.  Long voluntarily went to the RST Police Department that evening to speak with an officer

and was later detained.

Back at Paul Mart, Officer Reynolds located a single shell casing in the parking lot where

Jones-Bear Robe and Long's vehicles were parked, approximately twenty yards from the

entrance.  Officer Reynolds testified that he spoke with two witnesses on the night of the

incident, Jennifer Young ("Young") and James Bordeaux ("Bordeaux").  Officer Reynolds

testified that he generated a report which contained statements Young and Bordeaux made that

evening on the morning of May 18, 2015, before leaving his night shift.  Special Agent Cory

Provost ("Special Agent Provost"), the lead investigator on Long's case, was aware of Officer

Reynold's report.  Officer Reynolds testified that he was first advised that Long's case was

proceeding to trial approximately one week before trial.  Officer Reynolds testified that he

provided his report to the Assistant United States Attorney Kirk Albertson during their first

meeting on May 10, 2015—the first day of trial.  After voir dire and before opening statements,

the government issued subpoenas for Young and Bordeaux, amended its witness list, and

disclosed a copy of Officer Reynold's report to Long.  Young was located in time for trial and

testified, but Bordeaux could not be located.

In the afternoon on the second day of trial, Young testified that she saw the incident at

Paul Mart while parked at the Paul Mart gas pumps.  Young was standing outside her vehicle

with the driver's door open because she was getting money out of her purse.  She observed a

heavy-set man—which description matches Long's stature—standing at the passenger door of a

7

red SUV parked next to Paul Mart. He had reached for the SUV's passenger door and was yelling at someone in the vehicle about taking his license number down. She watched the vehicle reverse, which caused the man to roll under the vehicle's door onto the ground. After the vehicle had backed out and was coming forward, Young testified that the man started shooting a gun at the vehicle with his left hand. According to Young, the man was shooting while sitting on his backside on the ground, but that he was in the process of standing back up. She testified that she heard three shots. After seeing the incident, Young drove her vehicle around the block before returning to Paul Mart to get gas as originally intended. Young testified that she did not see a gun in the man's hand while he was at the passenger door; she only saw the man put his arm out to fire. She testified that the man then put the gun into his jacket pocket before entering the store. During her testimony Young watched the Paul Mart surveillance video. Young identified another woman on the video as Kim Denoyer ("Denoyer"). The video shows Denoyer run from inside Paul Mart to her vehicle close in time to when Young heard three shots fired.

Special Agent Provost photographed the area outside Paul Mart, including a trail of fluid that led out of the parking lot and towards the highway in the direction of the RST Police Department. Ex. 2. He spoke with Jones-Bear Robe the night of the incident and again the next day when he inspected Jones-Bear Robe's vehicle. Special Agent Provost photographed the front of the Escalade which had a damaged grill from an item that had been lodged in the radiator or transmission cooler. Ex. 2. The Escalade was impounded and Special Agent Provost later

8

removed a single bullet casing from the Escalade's radiator or transmission cooler.[11] Special Agent Provost did not find any other bullet holes on the Escalade. Although he was told that the passenger door was not closing properly, Special Agent Provost testified that he did not photograph the damage to the passenger door because he was not aware that Long had rolled under the door during the incident. Special Agent Provost did not take any photographs of Long or Long's clothing. Special Agent Provost also testified that an inquiry was submitted to the National Crime Information Center ("NCIC")—a global database where law enforcement can gather information on various persons—regarding Long using his name, social security number, and date of birth of July 22, 1982. The NCIC provided Special Agent Provost with Long's prior convictions, including a 2011 conviction for Domestic Abuse, which he requested and received a certified copy of from the tribal prosecutor. Ex. 5.

Approximately two hours after the incident, Delores voluntarily provided a Glock 27, .40 caliber firearm with no magazine[12] to the RST Police Department, bearing serial number VHG125. The government called two expert witnesses regarding the seized firearm, Special Agent Kurt Wheeler ("Special Agent Wheeler"), who has advanced training in firearms affecting interstate commerce, and Mateo Serfontain ("Serfontain"), a certified firearms examiner. Special Agent Wheeler testified that he evaluated descriptive information about the Glock 27, .40

---

[11] Special Agent Provost testified that the bullet seemed angled right to left, rather than up to down, but did not measure the height above the ground where the bullet casing was embedded in the radiator or transmission cooler.

[12] Special Agent Provost testified that without a magazine, the firearm would be single load, whereas with a magazine, the firearm would be semi-automatic. He was unaware if the firearm had a magazine in it at the time of the incident. Additionally, Special Agent Provost testified that after discharge, the firearm's casing would be ejected to the right of the shooter.

9

caliber, bearing serial number VHG125 at Special Agent Provost's request. Ex. 6. Special Agent Wheeler concluded that the firearm "did affect interstate and/or foreign commerce." Ex. 7. He testified that he confirmed that earlier conclusion upon inspecting the Glock the day before he testified, which showed that the Glock bore an Austria manufacturing mark. Serfontain testified that he performed lab work for ballistics recognition on the Glock, the fired bullet jacket that was recovered from the Cadillac Escalade's radiator or transmission cooler, and the fired cartridge case that was found in Paul Mart's parking lot. Exs. 8, 10. After a test fire, the Glock was found capable of discharging ammunition, and Serfontain determined with "practical certainty" that the fired cartridge case was fired from the Glock. The fired bullet jacket, however, was inconclusive. Ex. 9. Serfontain testified that the fired bullet jacket had class characteristics similar to the Glock, but because there were no individual class characteristics to compare, he was unable to determine whether the fired bullet jacket was fired from the Glock. Ex. 9.

Long called Delores and recalled Officer Reynolds as witnesses on his behalf. Delores testified that Long is right handed and the jacket Long was wearing has three outside pockets. She testified that she was inside Paul Mart during the incident, and that when Long bonded out of jail, approximately five or six days after the incident, Delores took photographs of Long's dirtied clothing and injuries, including knee scrapes, a kidney-area bruise, and abrasions to his elbow.[13] Ex. G–O. Ex. T. Because of the late disclosure of Officer Reynold's report and unavailability of Bordeaux, this Court permitted Long to elicit hearsay testimony from Officer

---

[13] Delores also testified how she and Long obtained concealed carry permits from the State of South Dakota. Ex. P.

Reynolds regarding statements Young and Bordeaux made the night of the incident. Officer Reynolds testified that Young told him that she heard what she thought was a single gunshot when attempting to get gas at Paul Mart. Officer Reynolds testified that Bordeaux reported that he saw a maroon SUV reversing quickly and he saw a man lying in front of the reversing vehicle. Bordeaux stated that he thought he heard a single noise that sounded like a vehicle backfiring.

Jones-Bear Robe's testimony at trial was somewhat inconsistent with prior statements she made and contradicted certain events depicted on the surveillance video. Jones-Bear Robe testified on direct examination that she heard two shots, but she later admitted on cross-examination that she was unsure whether she heard two, three, or four shots. Officer Little Elk testified that when he spoke with Jones-Bear Robe she reported that Long told her that she should sell more weed to get money and that Long later outside of Paul Mart pointed a gun at her head and said he was going to "shoot them bitches." Jones-Bear Robe told Special Agent Provost on the night of the incident that Long touched her shoulder, that later outside of Paul Mart Long had put a gun to her head and said he would "fucking kill" her, and that there were four shots fired, including one "bing" heard in the car. The next day, Jones-Bear Robe spoke with Special Agent Provost again and told him that Long used his chest to bump her, that Long fired three shots, and that Delores was standing outside Paul Mart saying "get her, get her." Jones-Bear Robe testified that she had no recollection of the second conversation with Special Agent Provost because she was still "shook up" from the night before. Dispatcher Searby

11

testified that Jones-Bear Robe reported that Long had fired two shots.[14]  The surveillance video

shows that Long kept his distance from Jones-Bear Robe while waiting in line, and he did not

appear to touch or otherwise make physical contact with Jones Bear-Robe inside the store.  Ex.

1.

## II. DISCUSSION

### A. New Trial Standard

Under Rule 33(a) of the Federal Rules of Criminal Procedure, a court "may vacate any

judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).

District courts have "wide discretion" in deciding whether to grant a new trial, United States v.

Malloy, 614 F.3d 852, 862 (8th Cir. 2010) (quoting United States v. Lincoln, 630 F.2d 1313,

1319 (8th Cir. 1980)), but should exercise "Rule 33 authority sparingly and with caution,"

United States v. Stacks, 821 F.3d 1038, 1044–45 (8th Cir. 2016) (quoting United States v.

Campos, 306 F.3d 577, 579 (8th Cir. 2002)).  Contrary to a motion for judgment of acquittal,

when analyzing a defendant's motion for new trial, a district court "can weigh the evidence,

disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the

verdict."  United States v. Knight, 800 F.3d 491, 504 (8th Cir. 2015) (quoting Campos, 306 F.3d

at 579); see also United States v. Johnson, 719 F.3d 660, 666 (8th Cir. 2013) (quoting United

States v. Samuels, 543 F.3d 1013, 1019 (8th Cir. 2008)).  The Court, however, may grant a new

---

[14] Dispatcher Searby testified dispatch calls are recorded, but unbeknownst to her, no recording
was available in this case.  Searby produced more records of the 911 call than what Special
Agent Provost had provided.  Special Agent Provost testified that the 911 audio system was
inoperable and not recording during that time.  He explained that the call was documented as a
"UN tab," to which Special Agent Provost does not have access to but Searby did.

trial under Rule 33 for "insufficiency of the evidence 'only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" United States v. Lacey, 219 F.3d 779, 783 (8th Cir. 2000) (quoting United States v. Brown, 956 F.2d 782, 786 (8th Cir. 1992)); see also United States v. Bordeaux, 570 F.3d 1041, 1048–49 (8th Cir. 2009) (quoting United States v. Starr, 533 F.3d 985, 999 (8th Cir. 2008)). New trial motions "based on the weight of the evidence are generally disfavored" because such remedy "is reserved for exceptional cases in which the evidence preponderates heavily against the verdict." Knight, 800 F.3d at 504 (internal quotation marks and quotations omitted).

## B. Alleged Brady Violation

Long argues that the government violated Brady by not disclosing the names of two witnesses, Bordeaux and Young, until after the trial started. Doc. 74 at 2. Those two witnesses—which through Young's testimony led to identification of a possible third witness, Denoyer—were unconnected to the victim and Long. Young, who was found in time to testify at trial, provided testimony that Long avers to have "helped the defense." Doc. 74 at 2.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material under Brady if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469–70 (2009); see also United States v. Ryan, 153 F.3d 708, 712 (8th Cir.1998) (citing Kyles v. Whitley, 514 U.S. 419, 433–34 (1995)). A "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's

13

behalf in the case, including the police." Kyles, 514 U.S. at 437. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). "Brady is violated if three requirements are met: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" United States v. Tyndall, 521 F.3d 877, 881 (8th Cir. 2008) (quoting Morales v. Ault, 476 F.3d 545, 554 (8th Cir. 2007)); see also Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

During the jury trial, this Court overruled Long's Brady objection because Brady does not require the government to produce evidence outside of its control, of which it is unaware, and with a separate semi-sovereign tribal organization. See Cohen's Handbook of Federal Indian Law §§ 4.01–4.06, at 203–288 (Nell Jessup Newton et al. eds., 2012) (outlining history, authority, structure, and operation of Indian nations and describing tribal authority as having inherent sovereign powers with federally imposed limitations). This very issue was previously addressed by this Court in United States v. Stoneman, No. CR 09-30101-RAL, 2010 WL 2710477 (D.S.D. July 8, 2010). In Stoneman, this Court held that information with the Rosebud Sioux Tribal Law Enforcement Services is not necessarily within the government's control because under the Indian Self-Determination Education Assistance Act, law enforcement functions on the Rosebud Sioux Indian Reservation are funded by Public Law 93–638 contracts.

14

Id. at *1–2 (citing 25 U.S.C. § 450f).  The language of those contracts—referred to as "638"

contracts—does not transform the tribal police department into a federal law enforcement

agency.  Id. at * 1 (citing United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993); Locke v.

United States, 215 F. Supp. 2d 1033, 1038 (D.S.D. 2002)).

        Long maintains that if tribal law enforcement is not required to disclose Brady materials

to the defense then "there are no Brady protections for Indian defendants in Federal Court,

except as the material might make [its] way to the U.S. Attorney's office."  Doc. 74 at 2.  The

government responds that the rationale in Stoneman applies in this case.  Doc. 75 at 4.

Alternatively, the government contends that even if the report were to be deemed in the

government's control by virtue of being with tribal law enforcement, a new trial is not warranted

because the report was disclosed prior to opening statements, the information was inculpatory,

Long cross-examined Young, and although Bordeaux was not located in time for trial, this Court

allowed Long to draw out Bordeaux's hearsay statements from Officer Reynolds on cross-

examination.  Doc. 75 at 4–6.

        A new trial is not warranted under Rule 33 for this claimed Brady violation.  First, the

holding and rationale in Stoneman are directly applicable in this case because both involve

information that was in control of the Rosebud Sioux Tribal Law Enforcement Services which is

an independent law enforcement agency under a 638 contract operated by a semi-sovereign tribe

apart from the federal government.  At least one other court, the United States District Court for

the District of New Mexico, has similarly held that Brady does not oblige the government to

obtain all information in possession of a tribal agency.  United States v. Badonie, No. CR 03-

2062 JB, 2005 WL 2312480, at *3 (D.N.M. Aug. 29, 2005) (holding that the Court could not

properly compel the United States to produce Navajo Nation files, including the personnel files from Navajo Nation officers whom the United States intended to call at trial, because the United States did not possess the files and stating that although "[t]he United States may have an obligation to seek information from 'closely aligned' United States agencies, . . . its obligation does not require it to seek information from other governments" (quoting United States v. Johnson, No. 96-40082-02-SAC, 1997 U.S. Dist. LEXIS 11586, *7 (D. Kan. June 9, 1997))).[15]

Second, Young was subpoenaed and testified, subject to Long's cross-examination. Although Long became aware of Young on the first day of trial, his cross-examination was not prejudiced by the recent disclosure because Young testified on the afternoon of the second day of trial. United States v. Almendares, 397 F.3d 653, 664 (8th Cir. 2005) ("Under the rule in our circuit Brady does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial."); see also Tyndall, 521 F.3d at

---

[15] This Court also located a case, United States v. Harry, from the District Court of New Mexico that originally found that text messages obtained by a Navajo Nation Criminal Investigator, but later lost not due to bad faith, before the tribal investigator was working the case with the United States Attorney's Office was not evidence subject to disclosure under Brady. 927 F. Supp. 2d 1185, 1193–1200, 1211 n.21, 1223–25 (D.N.M. 2013), modified in part on reconsideration, No. CR 10-1915 JB, 2014 WL 6065672 (D.N.M. 2013). Upon hearing additional evidence after the defendant filed a motion to reconsider, however, the court amended its prior opinion and order and determined that the tribal investigator had active communications with and received directions from the United States Attorney's Office on the case prior to obtaining the text messages. The court found that the text messages were within the government's control under Brady because the tribal investigator was "acting on behalf of" and participating in a "joint investigation" with the United States. 2014 WL 6065672, at *23. The court nevertheless denied the defendant's motion to suppress the text messages, because the text messages "had, at best, a marginally and/or only potentially useful value, and [] the United States did not fail to preserve the text messages in bad faith." Id. at *1. In Long's case, by contrast, the United States Attorney's Office was not directing tribal officers in the investigation and had no involvement in the case at all when Officer Reynolds interviewed Young and Bordeaux and made his report.

16

882 ("A mid-trial disclosure violates Brady only if it comes too late for the defense to make use of it.").

Finally, this Court allowed Long to present what Bordeaux had said, despite it being hearsay, because of Bordeaux's unavailability and the late disclosure of Bordeaux's interview by the tribal officer. Bordeaux told the tribal officer that he heard a single noise that sounded like a vehicle backfiring. That testimony is, at best, neutral evidence; Bordeaux did not report that he saw what happened or that he did not hear any noise that resembled a gun firing. See United States v. Gillings, 156 F.3d 857, 860 (8th Cir. 1998) (finding no Brady violation where the government delayed in disclosing lab report and fingerprint photographs to defense because evidence was neutral and speculative evidence that was not favorable to the defendant). Any prejudice or unfairness that would have resulted from Bordeaux's absence from trial was effectively blunted when this Court allowed Long to recall Officer Reynolds and elicit Bordeaux's hearsay statements. See Almendares, 397 F.3d at 664 (finding evidence of misidentification was disclosed in time to be effectively used by the defendant at trial because jury was aware of the evidence, and although defense counsel chose not to recall the witness who made the misidentification, defense counsel cross-examined another witness on the same topic and argued in closing that the misidentification created a reasonable doubt as to defendant's guilt); United States v. Koehler, 266 F.3d 937, 938 (8th Cir. 2001) (per curiam) (finding no Brady violation where evidence that was disclosed on the morning of the first day of trial was brought to light through witness at trial); see also United States v. Spry, 238 F. App'x 142, 149–50 (6th Cir. 2007) (holding that the lower court implemented measures to remedy a delayed Brady disclosure, including the opportunity to recall and cross-examine relevant witness).

17

Defense counsel could have used Bordeaux's out-of-court statements in his closing argument, but instead (and perhaps tactically), argued that the government did not follow up on its own evidence. In closing, defense counsel highlighted that Young, Bordeaux, and Denoyer were unconnected witnesses, that Young was the only one to testify, and that "Denoyer was probably in the best position to the situation." Whether Denoyer's testimony would have been helpful to Long is pure speculation of course.[16] Acknowledging that everyone agreed that Long shot at Jones-Bear Robe's vehicle, defense counsel urged the jury to find that Long was acting in self-defense or, at most, merely wanted to scare Jones-Bear Robe and K.M.J. Thus, because no Brady violation occurred, a new trial is not warranted on these grounds.

### C. Assault with a Dangerous Weapon Conviction

Next, Long contends that he is entitled to a new trial because the evidence preponderates heavily against the Assault with a Dangerous Weapon verdict. He argues that the jury was not able to properly weigh the evidence because Jones-Bear Robe's testimony was "not very credible," the best evidence of Long's intent was where the bullet lodged into the vehicle because he did not testify, the jury was presented with conflicting evidence, and eyewitnesses were discovered on the first day of trial. Doc. 74 at 3–4. The government acknowledges that conflicting evidence was presented to the jury regarding the number of shots fired and whether Long drew his firearm prior to or after being knocked to the ground, but responds that the evidence at trial still "weighs heavily *in favor* of the verdict." Doc. 75 at 7. The jury's verdict

---

[16] Long has placed nothing in the record in the seven weeks since the trial to suggest that Denoyer would have testified in a manner exculpatory to Long.

should not be disturbed based on speculation, the government asserts, and this case does not present an "exceptional case" that would warrant granting a new trial. Doc. 75 at 7.

The government had to prove the following essential elements at trial to obtain an Assault with a Dangerous Weapon conviction: (1) that Long assaulted Jones-Bear Robe; (2) that he used a dangerous weapon; (3) that he acted with the intent to do bodily harm to her; (4) that he was not acting in self-defense; (5) that he is an Indian; and (6) that the offense occurred within Indian country. See United States v. Littlewind, 595 F.3d 876, 884 (8th Cir. 2010); Bordeaux, 570 F.3d at 1047 (quoting United States v. Youngman, 481 F.3d 1015, 1020 (8th Cir. 2007)); United States v. Phelps, 168 F.3d 1048, 1056 (8th Cir. 1999). Long stipulated that he is an Indian and that the incident occurred in Indian county. Ex. 11.

Although Jones-Bear Robe made inconsistent statements, the jury could have reasonably relied upon her testimony to convict Long of Assault with a Dangerous Weapon because it was sufficiently supported by corroborative evidence. Her testimony about being inside Paul Mart at the same time as Long and Delores is corroborated by the surveillance video. Although the video contradicts Jones-Bear Robe's claim that Long made physical contact with her and that Delores exited the store before Long returned to get her, the video depicts a brief, verbal exchange occurred between the two. Jones-Bear Robe's call to dispatch was supported by K.M.J.'s, Kills in Water's, and Searby's testimony. Young corroborated Jones-Bear Robe's testimony that Long was at the passenger door of the vehicle yelling, Long was knocked to the ground when the vehicle reversed, and that Long fired shots at the vehicle. There were inconsistencies regarding what Long said to Jones-Bear Robe and K.M.J. while he was standing at the passenger door, whether they saw the gun in Long's right or left hand while he was at the

19

passenger door, and how many shots were fired. However, other testimony and evidence clearly established that at least one shot was fired at the vehicle. A bullet was recovered from the vehicle's radiator or transmission cooler, and the shell casing found in Paul Mart's parking lot matched Long's firearm.

Long did not dispute that he shot at the vehicle in which Jones-Bear Robe was a passenger after a verbal confrontation between them at the vehicle. Instead, defense counsel argued that Long did not possess the requisite intent to cause Jones-Bear Robe bodily harm, urging the jury to find that Long intended merely to scare Jones-Bear Robe or, alternatively, was acting in self-defense. Long's counsel properly exposed Jones-Bear Robe's prior inconsistent statements through cross-examination and in closing arguments. However, given the corroboration of material parts of Jones-Bear Robe's testimony, Jones-Bear Robe's testimony was not so "unreasonable or suspect" to convince this Court that a miscarriage of justice has occurred. United States v. Maybee, 687 F.3d 1026, 1032–33 (8th Cir. 2012) (declining to "second-guess" district court's evaluation of witness credibility on new trial motion grounded on insufficiency of evidence); United States v. Aguilera, 625 F.3d 482, 487 (8th Cir. 2010) (same); see also United States v. Clayton, 787 F.3d 929, 935–36 (8th Cir. 2015); United States v. Davis, 534 F.3d 903, 913–14 (8th Cir. 2008). Based on that evidence, the jury could have reasonably concluded that Long assaulted Jones-Bear Robe while she was a passenger in the vehicle with the intent to cause her bodily harm by shooting at her vehicle while she was in it, and that such an action did not constitute justifiable self-defense. A grant of new trial under Rule 33 "is reserved for exceptional cases in which the evidence preponderates heavily against the verdict." Knight, 800 F.3d at 504 (quoting United States v. Johnson, 474 F.3d 1044, 1051 (8th Cir. 2007)).

Long's case does not fall within that category, and thus a new trial is not warranted. See United States v. Garcia, 569 F.3d 885, 889–90 (8th Cir. 2009).

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Long's Motion for New Trial, Doc. 73, is denied.

DATED this 13ᵗʰ day of July, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE